RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 18a0014p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

LIBERTY COINS, LLC; JOHN MICHAEL TOMASO; WORTHINGTON JEWELERS, LTD.; ROBERT CAPACE,

*Plaintiffs-Appellees*,

*v.*

DAVID GOODMAN, et al.,

*Defendants*,

JACQUELINE T. WILLIAMS, in her official capacity as Director, Ohio Department of Commerce; AMANDA MCCARTNEY, in her official capacity as Consumer Finance Attorney of Division of Financial Institutions, Ohio Department of Commerce,

*Defendants-Appellants*.

No. 16-3735

---

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 2:12-cv-00998—Michael H. Watson, District Judge.

Argued:  June 22, 2017

Decided and Filed:  January 22, 2018

Before:  SILER, McKEAGUE, WHITE, Circuit Judges.

---

## COUNSEL

**ARGUED:**  Jennifer S. M. Croskey, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellants.  Maurice A. Thompson, 1851 CENTER FOR CONSTITUTIONAL LAW, Columbus, Ohio, for Appellees.  **ON BRIEF:**  Jennifer S. M. Croskey, Keith O'Korn, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellants.  Maurice A. Thompson, 1851 CENTER FOR CONSTITUTIONAL LAW, Columbus, Ohio, Curt C. Hartman, THE LAW FIRM OF CURT C. HARTMAN, Cincinnati, Ohio, for Appellees.

---

**OPINION**

---

McKEAGUE, Circuit Judge.  Plaintiffs Liberty Coins, LLC, and Worthington Jewelers, Ltd., bring facial and as-applied Fourth Amendment challenges to four warrantless search provisions in Ohio's Precious Metals Dealers Act and the accompanying regulations:  O.R.C. §§ 4728.05(A), 4728.06, 4728.07, and Ohio Admin. Code § 1301:8-6-03(D).  These laws equip state agents and local law enforcement with the authority to inspect certain records, articles, and information kept by precious metals dealers without first obtaining a warrant.  The district court held that these warrantless search provisions were unreasonable and unconstitutional on their face, and therefore did not address plaintiffs' as-applied claims.

For the reasons set forth below, we affirm in part and reverse in part.  We agree with the district court that the warrantless searches authorized by O.R.C. § 4728.05(A) and Ohio Admin. Code § 1301:8-6-03(D) are facially unconstitutional.  These search provisions are not necessary to furthering the state's interest in recovering stolen jewelry and coins nor do they serve as adequate warrant substitutes because they are overly broad in scope.  However, we reverse the district court's ruling as to §§ 4728.06 and 4728.07 because we conclude that the warrantless searches provided for in these subsections are facially constitutional.  Further, we dismiss plaintiffs' as-applied challenges to §§ 4728.06 and 4728.07 as not ripe.

**I**

We first provide a brief overview of the Precious Metals Dealers Act before turning to the facts of this appeal.

**A.  Precious Metals Dealers Act**

For over a century, Ohio indirectly regulated precious metals dealers through statutes governing pawnbrokers and secondhand dealers.  *See generally* R. 14-1 (compiling the legislative history of these various laws).  As prices for gold and silver increased, the state found that such dealers provided easy avenues for thieves to re-sell and profit from stolen jewelry and

coins. *See* Appellant Br. at 31; R. 23-3, Exh. DXD at 4, PID 369. Therefore, in 1987, the Ohio General Assembly sought to impose stricter standards on them through the passage of the Precious Metals Dealers Act (PMDA). The Act defines a "precious metals dealer" as any person who "holds himself, herself, or itself out to the public" as being "engaged in the business of purchasing articles made of or containing gold, silver, platinum, or other precious metals or jewels . . . ." O.R.C. § 4728.01(A). The Act tasks the Division of Financial Institutions within Ohio's Department of Commerce with general enforcement responsibility. § 4728.10.

The PMDA requires every dealer in precious metals to first apply for and obtain a license. § 4728.02(A). The state conducts investigations of all applicants and has the power to issue licenses "to any person of good character, having experience and fitness in the capacity involved, who demonstrates a net worth of at least ten thousand dollars and the ability to maintain that net worth during the licensure period." § 4728.03(B)(1). Prospective licensees must pay a $200 investigation fee and, upon being licensed, an annual renewal fee as well. § 4728.03(C)–(D). Licensees are required to post, in a "conspicuous place" at their business location, (1) their license and (2) a statement that they have no right to retain stolen goods. § 4728.04(A)–(B). Certain businesses are exempt from licensure, for example, jewelry stores whose monthly precious metals purchases represent less than 25% of their total inventory and shops that buy coins as "numismatic objects, and not for their content as precious metals." *See, e.g.*, § 4728.11(E)–(F). However, even these exempt businesses are subject to certain requirements under the Act. *See* § 4728.12.

Beyond licensure, the PMDA also imposes recordkeeping requirements and provides state agents and local police with power to search the records and businesses of dealers without a warrant. The four sections of the PMDA that authorize warrantless searches form the heart of this appeal. The first challenged provision, § 4728.05(A), provides the state with the authority to "investigate the business" of both licensees and non-licensees who deal in precious metals "and for that purpose" provides it with "free access to the books and papers thereof and other sources of information with regard to the[ir] business[es]." Even though it allows officials to look at this information without a warrant, § 4728.05 also arms the state with administrative powers to

effectuate compliance, including the power to compel, issue subpoenas, and apply to the court for an order, injunction, or temporary restraining order. *See, e.g.*, § 4728.05(B)(5).

Section 4728.06—the second provision at issue—requires licensees to maintain books and records in a form approved by the state. The records must include a detailed description of all precious metals purchased as well as identifying information about the seller. This information must be kept at the licensed location "open to the inspection of the superintendent or chief of or head of the local police department . . . ." Section 4728.06 also requires licensees, "upon demand," to show authorities any precious metal within their possession that is listed in these records. *Id.*

Similarly, § 4728.07—the third provision at issue in this case—requires licensees to keep separate records for the benefit of local police departments. Specifically, this section mandates that licensees keep "on forms furnished by the police department, a description of all articles received" and make these forms available to the police "every business day."

The fourth and final challenged provision is a regulation promulgated pursuant to the PMDA, which elaborates on licensees' recordkeeping duties and advises them how to comply with state inspections. This regulation, Ohio Administrative Code § 1301:8-6-03(D), contemplates that the state shall have the authority to inspect "at all times" the "books, forms, and records, and all other sources of information with regard to the business of the licensee" in order to ensure "that the business of the licensee is being transacted in accordance with law." This regulation also requires licensees to maintain their records and inventory at the licensed location.

In addition to these four sections authorizing warrantless searches, several other sections of the PMDA are pertinent to this appeal. Section 4728.09(A) prohibits licensees from either reselling or altering the form of any article purchased for at least five days. This holding period can be extended to thirty days if the police have "probable cause" to believe that an article within a licensee's possession is stolen property. § 4728.09(B). The PMDA also provides for a criminal enforcement scheme. Section 4728.10 requires state agents to "make all reasonable

efforts to discover alleged violators" of the Act and to "notify the proper prosecuting officer." Section 4728.99, in turn, imposes criminal penalties for violations.

## B. Factual Background

Liberty Coins, LLC, is a coin shop, located in Delaware County, Ohio, that buys and sells various forms of gold and silver. R. 72, Amended Compl. ¶¶ 5–6, PID 826. It is owned by John Michael Tomaso. *Id.* ¶ 6, PID 826. Although it admits that it "holds itself out to the public" as a precious metals dealer, Liberty Coins does not have a PMDA license. R. 26, TRO Tr. at 91, 110, PID 564, 583. In August 2010, the state got wind of that fact and sent out an inspector to investigate. R. 26, TRO Tr. at 54–55, PID 526–27. The inspector spoke with Tomaso and left forms for him to complete so that the state could determine whether Liberty Coins was eligible for an exemption from licensure. *Id.* at 71–72, PID 543–45. The inspector did not request to see any business records during his visit to Liberty Coins. *Id.* at 74, PID 547. After Tomaso failed to complete the necessary forms, the state sent a letter requiring him to "produce business records to demonstrate the amount of precious metals [it had] purchased from the public over the last twelve (12) months." R. 23-1, Exh. JXI at 1, PID 339.

Tomaso never responded to the state's inquiries, and Liberty Coins never applied for a PMDA license. Instead, they filed a 42 U.S.C. § 1983 action against various Ohio Department of Commerce officials. R. 1, Verified Compl. ¶¶ 11–12, PID 4–5. They sought declaratory and injunctive relief, arguing that the PMDA was facially invalid under the First, Fourth, and Fourteenth Amendments. *Id.* ¶ 1, PID 2. The district court granted a preliminary injunction to Tomaso and Liberty Coins on their First Amendment claim, prohibiting the state from enforcing the PMDA because it placed an impermissible burden on commercial speech, i.e., the ability to advertise one's willingness to buy precious metals. *Liberty Coins, LLC v. Goodman*, 977 F. Supp. 2d 783, 792 (S.D. Ohio 2012). A panel of this court reversed. 748 F.3d 682 (6th Cir. 2014).

On remand, Liberty Coins and Tomaso added Worthington Jewelers, an "upscale jewelry store and bridal boutique" located in Worthington, Ohio, and its owner, Robert Capace, as plaintiffs. R. 72, Amended Compl. ¶¶ 8–11, PID 826; Appellee Br. at 7. Unlike Liberty Coins,

Worthington Jewelers was licensed under the PMDA at the time this amended complaint was filed. R. 72, Amended Compl. ¶ 54, PID 833. That license has since lapsed, and Worthington Jewelers spent several years operating without a license before obtaining another one on October 26, 2015. R. 98-1, Capace Decl. ¶ 2, PID 1141. Under the Act, that license expired on June 30, 2017, *see* § 4728.03(D), and it is unclear whether Worthington Jewelers sought renewal.

In their amended complaint, Tomaso, Liberty Coin, Worthington Jewelers, and Capace again sought various forms of constitutional relief, but their Fourth Amendment claim is the only one pertinent to this appeal. Specifically, they alleged that four sections of the PMDA—O.R.C. §§ 4728.05(A), 4728.06, and 4728.07 and Ohio Administrative Code § 1301:8-6-03—authorized warrantless searches that were unconstitutional under the Fourth Amendment "[e]ither facial[ly] or as-applied." R. 72, Amended Compl. ¶ 160, PID 846; *see generally id.* ¶¶ 139–60, PID 844–46. Several dispositive motions were then filed with regards to this claim: The state filed a motion to dismiss the amended complaint, R. 77, Mot. to Dismiss at 1, PID 859, and both the plaintiffs and the state filed motions for summary judgment, *see* R. 98, Plaintiff Mot. for SJ at 22, PID 1124; R. 103, State Mot. for SJ at 3, PID 1151.

The district court granted summary judgment to plaintiffs and denied both of the state's motions. It agreed that the warrantless searches authorized by the PMDA were facially unconstitutional and enjoined their enforcement. R. 113, Op. and Order at 35, PID 1433. The district court based its ruling primarily on the Supreme Court's recent decision in *City of Los Angeles v. Patel*, 135 S. Ct. 2443 (2015). *See id.* at 1, 21–32, PID 1399, 1419–30. First, it concluded that the PMDA search provisions "suffer[ed] from the same constitutional deficiencies as" the Los Angeles ordinance that the Supreme Court struck down in *Patel*: they offered no opportunity for dealers to seek "neutral, precompliance review" before being faced with either refusing to submit to a search or being charged with a crime. *Id.* at 26, PID 1424. Moreover, the district court held that even if these businesses were entitled to a reduced expectation of privacy because they were "closely regulated," the statutory provisions were still unconstitutional under the three-part test governing warrantless searches of those industries. *Id.* at 28–32, PID 1426–30. The district court did not explicitly discuss plaintiffs' as-applied challenges. This appeal followed. After oral argument, the parties submitted a joint brief, at the

panel's request, which explicitly delineated the statutory language that plaintiffs have challenged as unconstitutional.

**II**

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. A search is generally unreasonable if it is not conducted pursuant to a warrant issued upon probable cause. *Camara v. Mun. Court of City & Cty. of San Francisco*, 387 U.S. 523, 528–29 (1967). This general rule "applies to commercial premises as well as homes," *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 312 (1978), and protects business owners' reasonable expectations of privacy in their commercial property, *New York v. Burger*, 482 U.S. 691, 699 (1987) (citing *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring)).

There are, however, exceptions to this warrant requirement. When a search is conducted for a "special need" other than to investigate criminal wrongdoing, the probable-cause standard is modified. For example, when a search is conducted pursuant to an administrative regime, the government need only make a lesser showing that a search is in accord with "reasonable legislative or administrative standards." *Camara*, 387 U.S. at 538. For an administrative-search scheme to be constitutional, it generally must offer the subject of the search an opportunity to seek precompliance review of the request by a neutral decisionmaker prior to the imposition of criminal penalties. *See Patel*, 135 S. Ct. at 2452–53.

The tempered reasonableness standard governing administrative searches is relaxed even further for searches of businesses in "closely regulated" industries. *Id.* at 2454. No warrant or opportunity for precompliance review may be required at all for searches conducted of businesses in these industries since they are already subject to extensive government oversight and accordingly possess reduced privacy interests. *See Barlow's, Inc.*, 436 U.S. at 313 (recognizing that "[c]ertain industries have such a history of government oversight that no reasonable expectation of privacy could exist for a proprietor over the stock of such an enterprise") (internal citation omitted).

Nevertheless, even warrantless searches of businesses in closely regulated industries must meet three criteria, as delineated by the Supreme Court in *New York v. Burger*, in order to be deemed reasonable, and thus constitutional, under the Fourth Amendment: (1) "there must be a 'substantial' government interest that informs the regulatory scheme pursuant to which the inspection is made"; (2) "the warrantless inspections must be necessary to further the regulatory scheme"; and (3) "the statute's inspection program, in terms of the certainty and regularity of its application, must provide a constitutionally adequate substitute for a warrant." *Burger*, 482 U.S. at 702–03 (internal quotations omitted; brackets removed) (the "*Burger* test"). When the government seeks to impose a penalty for failure to comply with a warrantless inspection, it is the government's burden to establish that the warrantless search fits within this exception. *McLaughlin v. Kings Island*, 849 F.2d 990, 994 (6th Cir. 1998).

Lastly, plaintiffs lodging Fourth Amendment challenges to statutes may bring either facial or as-applied challenges. *Patel*, 135 S. Ct. at 2449. "A facial challenge is an attack on the statute itself," and while more difficult to "mount successfully" than challenges to particular applications of a statute, the Supreme Court recently clarified that these types of challenges "are not categorically barred or especially disfavored." *Id.*

## A. The PMDA does not provide dealers the opportunity to seek precompliance review.

The warrantless searches in question are authorized by the PMDA for the purpose of ensuring compliance with the Act, which the state believes will allow it to retrieve stolen jewelry and coins and both deter criminals from selling these items to licensed dealers and prevent their resale back into the marketplace. Given this "special need," the question is whether the PMDA warrantless search provisions are constitutional under the administrative search doctrine. Answering this ultimate question involves answering two sub-questions: (1) Does the PMDA give dealers the chance to seek precompliance review, that is, to challenge a warrantless search request prior to being criminally sanctioned?; and (2) if not, is precious metals dealing a closely regulated industry, and, if so, is *Burger*'s three-part test satisfied?

The answer to the first of these sub-questions is no. *City of Los Angeles v. Patel* governs our analysis. *Patel* involved a Los Angeles city ordinance that required hotel operators to make

their guest registries open to warrantless inspections by local police. *Patel*, 135 S. Ct. at 2447. A failure to do so was punishable by up to six months in jail and a $1,000 fine. *Id.* at 2448. A group of hotel operators argued that this ordinance was facially invalid under the Fourth Amendment, and five Justices of the Supreme Court agreed. *Id.* Since hotels were not a closely regulated industry, the ordinance was unconstitutional because it "penalize[d] [operators] for declining to turn over their records without affording them any opportunity for precompliance review." *Id.* at 2247.

The PMDA is indistinguishable from *Patel* with regards to its lack of precompliance review. Like the Los Angeles city ordinance, the challenged PMDA provisions authorize warrantless searches of the books, records, articles, and other items pertaining to the businesses of precious metals dealers. And while the PMDA does provide inspectors with process-based, civil remedies to secure compliance with a warrantless search request, *see, e.g.*, § 4728.05(B)–(E), the statute simultaneously allows for the possibility of criminal penalties. Section 4728.99 provides that dealers who oppose a search could be "guilty of a misdemeanor of the first degree on a first offense," and in Ohio, a first-degree misdemeanor carries up to 180 days in jail, O.R.C. § 2929.24(A)(1). As the Supreme Court said in *Patel*, business owners cannot be forced to choose between being "arrested on the spot" and standing on their Fourth Amendment rights. *Patel*, 135 S. Ct. at 2452.

The state argues that division of finance officials do not have the power to bring criminal actions, and thus the threat of criminal penalties is illusory. But the statute requires these regulators to "notify the proper prosecuting officer whenever [they] ha[ve] reasonable grounds to believe that a violation has occurred." § 4728.10. Moreover, police may accompany officials on any search, and in some cases, they have the authority to conduct the searches themselves. *See, e.g.*, § 4728.06–07. Therefore, despite the state's assurance that "[t]here is no evidence in the record of anyone having been arrested or threatened with arrest," Appellant Br. at 42, the statute clearly contemplates this possibility, making it no different than the ordinance at issue in *Patel*. Thus, we turn to the second sub-question. In order for the PMDA warrantless search provisions to withstand Fourth Amendment scrutiny, precious metals dealing must be considered a "closely regulated industry" and the searches the PMDA calls for must meet *Burger*'s three-part test.

**B. Precious metals dealing is a closely regulated industry.**

In determining whether an industry is closely regulated, we consider (1) "the pervasiveness and regularity" of regulations governing an industry; (2) "the duration of a particular regulatory scheme"; and (3) whether other states have imposed similarly extensive regulatory requirements. *Burger*, 482 U.S. at 701, 705. Most recently, the Supreme Court has reiterated that closely regulated industries are the "exception," and suggested that businesses operating within these industries all "pose[] a clear and significant risk to the public welfare." *Patel*, 135 S. Ct. at 2454–55. The Court has identified four closely regulated industries: (1) liquor sales (*Colonnade Corp. v. United States*, 397 U.S. 72 (1970)); (2) gun sales (*United States v. Biswell*, 406 U.S. 311 (1972)); (3) mining (*Donovan v. Dewey*, 452 U.S. 594 (1981)); and (4) automobile junkyards (*Burger*, 482 U.S. 691). It has concluded that hotels are not closely regulated (*Patel*, 135 S. Ct. at 2443) and also rejected giving "all businesses involved in interstate commerce" this label (*Barlow's, Inc.*, 436 U.S. 307).

The Sixth Circuit has categorized pharmacies (*United States v. Acklen*, 690 F.2d 70 (6th Cir. 1982)) and the sand and gravel industry (*Mashall v. Nolichuckey Sand Co.*, 606 F.2d 693 (6th Cir. 1979)) as closely regulated, but not bee apiaries (*Allinder v. Ohio*, 808 F.2d 1180 (6th Cir. 1987). The Fourth Circuit and the Michigan Court of Appeals have found precious metals dealing to fit within this category of businesses. *See Gallaher v. City of Huntington*, 759 F.2d 1155 (4th Cir. 1985); *see also People v. Pashigian*, 388 N.W.2d 259 (Mich. Ct. App. 1986) (per curiam).

The state argues that precious metals dealing is analogous to running an automobile junkyard, so it qualifies as a closely regulated industry under *Burger* and its progeny. Plaintiffs refute this association, arguing that *Patel* significantly narrowed the test for closely regulated industries and that, just as hotels are not closely regulated, neither are precious metals dealers. We agree with the state. Because we find no meaningful difference between the regulatory scheme at issue in *Burger* and the one here, notwithstanding the Court's recent decision in *Patel*, we conclude that precious metals dealing is a closely regulated industry.

First, the regulations governing precious metals dealers are sufficiently pervasive. In fact, they are nearly identical to those the Supreme Court deemed "extensive" in *Burger*. 482 U.S. at 703–04. There, the Court recognized the numerous obligations placed on junkyard owners:  to obtain a license, which meant meeting certain requirements and paying a fee; to maintain a "police book" containing a record of each car or part bought and sold; to make this book available for inspection "by the police or any agent of the Department of Motor Vehicles"; and to display their registration numbers at their businesses and on all vehicle parts. *See id.* at 704–05.  Automobile junkyard owners were also subject to civil and criminal penalties and loss of licensure for failing to comply with the state statute. *Id.*

Indistinguishably, the PMDA requires business owners to obtain a license by meeting delineated criteria and paying a fee (§ 4728.02–03); to "keep and use books and forms" detailing information about the precious metals they purchase (§ 4728.06–.07); to make their records—as well as their businesses more generally—open to inspection by the superintendent of financial institutions or the local police department (*id.*; *see also* § 4728.05(A); Ohio Admin. Code § 1301:8-6-03(D)); and to display their license "in a conspicuous place in the office where business is transacted" (§ 4728.04(A)).  Precious metals dealers also face comparable penalties for violating the PMDA (§§ 4728.05(B)–(E); 4728.99).

These requirements are more comprehensive than those applicable to the hotel industry in *Patel*.  For example, while the licensing requirement there carried little weight since "[a]ll businesses in Los Angeles need a license to operate," *Patel*, 135 S. Ct. at 2455, the PMDA's licensing requirements are carefully tailored to precious metals dealers specifically. *See, e.g.*, § 4728.03(A) and (B) (requiring dealers to have "sufficient . . . experience in the business of precious metals" and to demonstrate "a net worth of at least ten thousand dollars").  Additionally, in *Patel*, many of the hotel regulations relied upon by the state were applicable to a broader subset of businesses—such as all rental properties—while the PMDA is a self-contained statute applying solely to businesses dealing in precious metals. *See id.* at 2455.  This makes precious metals dealers accountable to a whole host of laws above and beyond those applicable to all businesses, such as the minimum wage and maximum hour laws that the Court found

insufficient to render an industry "closely regulated" in *Patel*. *Cf. id.* (citing *Barlow's, Inc.*, 436 U.S. at 314).

Second, the history of regulation governing precious metals dealers and automobile junkyards stems from a common origin. In *Burger*, while the Court noted that "automobile junkyards and vehicle dismantlers ha[d] not been in existence very long" at that time, these businesses were "simply [] new branch[es] of an industry that ha[d] existed, and ha[d] been closely regulated, for many years"—the secondhand shop or general junkyard. *Id.* at 706 (recognizing that "[b]oth share the purpose of recycling salvageable articles and components of items no longer usable in their original form"). Since automobile junkyards were simply a subset of an industry historically subject to close regulation, these business owners were thus on notice that they were subject to careful government oversight. *See id.* at 706–07 (noting that junk shop laws had been on the books "for at least 140 years"); *see also Patel*, 135 S. Ct. at 2455 (emphasizing that closely regulated industries are those that put business owners "on notice that their 'property will be subject to periodic inspections undertaken for specific purposes'" (quoting *Burger*, 482 U.S. at 705 n.16)).

Ohio has regulated precious metals even longer than New York had regulated automobile junkyards at the time *Burger* was decided. The New York law had only been in effect for seven years at the time *Burger* was decided, yet the first iteration of the PMDA went into effect in 1987, more than thirty years ago. Moreover, just like automobile junkyard owners had been governed by more universal laws pertaining to general junkyards and secondhand goods, *Burger*, 482 U.S. at 706, precious metals dealers, too, were previously subject to regulation under pawnbroker and secondhand dealing statutes since 1863. *See, e.g.*, R. 14-1, Appendix to Leg. Hist. at 3–4, PID 196–97. These old laws subjected dealers to periodic searches as well. *Id.* at 3, PID 197 (requiring pawnbrokers to "keep a correct list and description in a book" of all items bought and sold which "shall at all times be open to the inspection of the chief of police"); *cf. Patel*, 135 S. Ct. at 2455–56 (discounting historical laws requiring hotels to provide suitable lodging because they did little to inform owners that they could one day be subject to warrantless search). Like automobile junkyards analogized to the general junk shop, precious metals dealing is "simply a new branch" of the age-old pawnbroker tree. *Burger*, 482 U.S. at 706.

Third, and relevant to the question of close regulation, Ohio has provided evidence that many other states also regulate precious metals dealers. *Id.* at 698 n.11, 705 (noting that "other States besides New York [that] have imposed similarly extensive regulations on automobile junkyards," which "further support[ed] the 'closely regulated' status of [that] industry"). As Ohio points out, more than thirty other states have laws on their books governing either pawnbrokers and secondhand dealers more generally, or precious metals dealers specifically. *See, e.g.*, ALA. CODE 1975 § 8-34-3; GA. CODE ANN. § 43-37-1 *et seq.*; MICH. COMP. LAWS § 445.481 *et seq.* In sum, *Burger* fully supports the conclusion that precious metals dealing is a closely regulated industry.

Plaintiffs argue that *Patel* forecloses this result by limiting the businesses that may qualify as closely regulated to only those that are "ultra-hazardous." Appellee Br. at 13. We disagree. While *Patel* undoubtedly clarified the application of *Burger*, we do not read *Patel* as narrowly as plaintiffs suggest. *Patel* simply recognized that the industries the Court had deemed closely regulated in the past—liquor, firearms, mining, and automobile junkyards—all involved "a clear and significant risk to the public welfare" and were "intrinsically dangerous." *Patel*, 135 S. Ct. at 2444–45 & n.5. For example, the Court acknowledged that, unlike hotels, automobile junkyards met these standards because they "provide[d] the major market for stolen vehicles and vehicle parts." *Id.* (quoting *Burger*, 482 U.S. at 709). Precious metals dealing, too, presents an analogous danger because it provides thieves with a marketplace by which to sell stolen articles made of precious metals. *See, e.g.*, R. 23-3, Exh. DXD at 4, PID 369. A finding that precious metals dealing is closely regulated is therefore in line with *Patel*. The pervasiveness of the PMDA's regulatory scheme, the history of laws governing precious metals dealers specifically and pawnbrokers more generally, and the analogous laws in other states, all suggest that precious metals dealing, like running an automobile junkyard, is a closely regulated industry.

**C.     Under *Burger's* 3-part test governing warrantless searches of closely regulated industries, the searches contemplated by O.R.C. § 4728.05(A)[1] and Ohio Administrative Code § 1301:8-6-03(D) are unconstitutional on their face, but those in O.R.C. §§ 4728.06 and 4728.07 withstand plaintiffs' facial challenge.**

Both parties concede that the state has a substantial interest in regulating precious metals. *See* Appellant Br. at 31; Appellee Br. at 26. Therefore, only the latter two parts of the *Burger* test—whether the warrantless searches are necessary to further the state's proffered interests and whether the statutory provisions serve as adequate warrant substitutes—are at issue. First, warrantless searches are necessary if "a warrant requirement could significantly frustrate effective enforcement of the Act." *Dewey*, 452 U.S. at 603. This may be the case when the objects of a search lend themselves to easy concealment or alteration, making "unannounced, even frequent, inspections [] essential." *Biswell*, 406 U.S. at 316. For example, in *Dewey*, the Court determined that warrantless searches of mines were necessary due to the "notorious ease with which many safety or health hazards may be concealed if advance warning of inspection is obtained." 452 U.S. at 603 (quoting S. REP. 95-181 at 27 (1977)).

Warrantless searches might also be necessary if the search objects are likely to change hands quickly or if unannounced inspections will otherwise constrain the market in illicit goods. For example, in *Burger*, state officials professed the need to conduct impromptu inspections of automobile junkyards in order to identify stolen items before they were resold. *Burger*, 482 U.S. at 710. The *Burger* Court sanctioned warrantless searches for this purpose because "stolen cars and parts often pass quickly through an automobile junkyard," so "frequent" and "unannounced" inspections were necessary to detect them. *Id.* The Court also credited the state's belief that, by "controlling the receiver" of stolen property, i.e., the junkyard owners, thieves would be less inclined to unload their stolen merchandise with these individuals, thereby deterring theft. *Id.* at 709. Lastly, the Supreme Court has cautioned that simply seeking to prevent falsification of records or looking to avoid administrative burdens will not be sufficient to conduct a warrantless search. *Patel*, 135 S. Ct. at 2456.

---

[1]To the extent the district court's order enjoined the state from enforcing all of § 4728.05, *see* R. 113, Opinion and Order at 35, PID 1433, both parties acknowledge that this was a scrivener's error and that the warrantless search language contained in part (A) is the only portion of that subsection being challenged.

Beyond the necessity requirement, a statute's inspection program must also, "in terms of the certainty and regularity of its application," serve as a "constitutionally adequate substitute for a warrant." *Burger*, 482 U.S. at 702 (internal quotation marks and citation omitted). This means a statute must do two things. It must be "sufficiently comprehensive" so that businesses are on notice that they will be subject to periodic searches of a properly defined scope. *Id*. Additionally, it must constrain the discretion of an inspecting officer by being "carefully limited in time, place, and scope." *Id.* Searches that are "so random, infrequent, or unpredictable that the owner, for all practical purposes, has no real expectation that his property will from time to time be inspected by government officials" will not be permitted. *Dewey*, 452 U.S. at 599.

In *Dewey*, the Supreme Court upheld an inspection regime that required searches of all surface mines "at least twice annually" and of all underground mines "at least four times annually," and also mandated routine follow-up searches when violations were found. *Id.* at 604. And in *Burger*, New York's law passed muster because it provided for inspections on a "regular basis," and only "during [] regular and usual business hours." *Burger*, 482 U.S. at 694 n.1, 711. But in *Patel*, the City of Los Angeles statute was more open-ended, simply requiring that hotel guest records "shall be made available," with the only caveat that "[w]henever possible, the inspection shall be conducted at a time and in a manner that minimizes interference with the operation of the business." *Patel*, 135 S. Ct. at 2448. The Supreme Court found this to be deficient. *Id.* at 2456.

### 1. Sections 4728.06 and 4728.07

Given this precedent, we think that the warrantless searches authorized by §§ 4728.06 and 4728.07 satisfy the latter two parts of the *Burger* test. We address these two provisions first because we believe that, unlike the others, they are narrowly tailored to address the state's proffered need to curb the market in stolen precious metals.

### a. Necessity

Section 4728.07 requires licensees to detail, on police-approved forms, a description of all precious metals purchased, and to make these forms available to the police each business day. That section, being challenged in its entirety, is reproduced below:

> **Each person licensed under Chapter 4728. of the Revised Code, shall, every business day, make available to the chief or the head of the local police department, on forms furnished by the police department, a description of all articles received by the licensee on the business day immediately preceding, together with the number of the receipt issued.**

Providing the police access to this information without having to obtain a warrant furthers the state's interest in tracking down stolen items containing precious metals and returning them to their lawful owners.[2] *See* Appellant Br. at 16, 34. Police will be able to cross-reference the lists of items purchased by dealers with reports of stolen coins, rings, or other precious metals. It is important for police to have access to these forms quickly in order to recover stolen items before a dealer melts the precious metal into another form, thus making it unidentifiable, or resells it back into the marketplace, making it difficult to trace. *See Burger,* 482 U.S. at 710; *Dewey,* 452 U.S. at 602–03.

Should the report of a missing ring, for example, match the description of a ring recently purchased by a precious metals dealer in the area, § 4728.06 works in tandem with § 4728.07 to allow the state or local police to quickly view the object as well as information about the seller:

> Every person licensed under this chapter shall keep and use books and forms approved by the superintendent of financial institutions, which shall disclose, at the time of each purchase, a full and accurate description including identifying letters or marks thereon of the articles purchased, with the name, age, place of residence, driver's or commercial driver's license number or other personal identification, and a short physical description of the person of the seller. The licensee also shall write in the book the name of the maker. The licensee shall keep the books in numerical order at all times at the licensed location, **open to the inspection of the superintendent or chief of or head of the local police department, a police officer deputed by the chief or head of police, or the**

---

[2]In the Joint Submission of the parties filed after oral argument, the state asked us to uphold this provision as a mere reporting requirement, rather than as authorizing warrantless searches. We need not address this argument, however, because we find that § 4728.07 is constitutional even if construed as a search provision.

**chief executive officer of the political subdivision thereof. Upon demand of any of these officials, the licensee shall produce and show an article thus listed and described which is in the licensee's possession.**[3]

If the ring bought by the dealer indeed appears to be the stolen item, the dealer will then be required under the PMDA to return it to its rightful owner, *see* § 4728.04(B), and law enforcement will have a lead on the thief, thereby furthering the state's interests.

Like in *Burger*, warrantless searches of the articles themselves, as provided for in § 4728.06, are necessary given the fluid and transitory nature of articles made of precious metals. *Burger*, 482 U.S. at 710. Although § 4728.09(A)–(B) of the PMDA require precious metals dealers to retain all purchased articles for five days, increased to thirty if police have probable cause to suspect an item is stolen, it is not difficult to imagine a situation where these moratoriums would be insufficient to compensate for the police's need to obtain a warrant. For example, if the police do not become aware of a stolen item or match it with a dealer's records until more than thirty days from the time it was initially sold, the Act's holding periods do no work. In these situations, in order for the police to identify and recover a stolen item before it is altered or resold, the flexibility to conduct "unannounced" inspections may very well be "essential." *Biswell*, 406 U.S. at 316.

Moreover, it is rational for the state to believe that warrantless searches of a licensee's purchasing records are necessary to (1) deter thieves from stealing precious metals in the first place because their chances of cashing out without suspicion would be diminished; and (2) prompt dealers themselves to be more vigilant in the purchases that they make. *See Burger*, 482 U.S. at 709. And these interests are sufficiently weighty to pass Fourth Amendment scrutiny. *See, e.g., Biswell*, 406 U.S. at 315–16 (finding warrantless inspection of weapons dealers "crucial" to the regulatory scheme since it ensured "weapons [were] distributed through regular channels and in a traceable manner and ma[de] possible the prevention of sales to undesirable customers and the detection of the origin of particular firearms"); *see also Exotic*

---

[3]Only the bolded language in § 4728.06 is being challenged by plaintiffs as facially unconstitutional. Similarly, the plaintiffs only lodge challenges to portions of § 4728.05(A) and Ohio Administrative Code § 1301:8-6-03(D). These two sections are reproduced later in the opinion, and once again, the bolded language denotes the parts of those provisions that are in dispute.

*Coins, Inc. v. Beacom*, 699 P.2d 930, 940–42 (Colo. 1985) (en banc) (upholding parts of Colorado's Purchasers of Valuable Articles Act and noting that imposing record-keeping requirements on the purchasers of precious metals would curb "illicit traffic in stolen valuable articles").

The state's professed needs in this case are distinguishable from the one the Supreme Court deemed inadequate in *Patel*. There, Los Angeles claimed that warrantless searches of hotel registries were necessary to prevent operators from falsifying their records. *Patel*, 135 S. Ct. at 2456. The Court explained that the city could prevent this risk without resorting to warrantless searches by, for example, obtaining an ex parte warrant or by "guarding the registry" while an administrative warrant is challenged. *Id.* Here, in contrast, the state's underlying needs as to §§ 4728.06 and 4728.07 relate not to ensuring the correctness of records, but to deterring both sellers and purchasers alike from engaging in suspect transactions involving precious metals. We conclude that these provisions are more akin to those at issue in *Burger* and its progeny in this respect and therefore satisfy the necessity requirement.

### b. Constitutionally Adequate Substitute

Additionally, § 4728.06 and § 4728.07 serve as constitutionally adequate warrant substitutes. First, they apply only to licensed precious metals dealers who have chosen to enter this closely regulated industry. Second, they carefully limit the scope of the warrantless searches to only a narrow subset of information—purchasing records and the precious metals themselves. The statutes upheld in *Burger* and *Biswell* were analogous in this respect. *Burger*, 482 U.S. at 711 (permitting warrantless searches of the records and car parts of automobile junkyards); *Biswell*, 406 U.S. at 312 n.1 (same as to the records and inventory of gun dealers). This delineated scope notifies inspectors of the parameters of the permitted search, *Burger*, 482 U.S. at 711, and ensures that "[t]he dealer is not left to wonder about the purposes of the inspector or the limits of his task," *Biswell*, 406 U.S. at 316. Third, § 4728.07 specifies that licensees may be required to provide a description of all precious metals purchased each business day. Fourth, § 4728.06 ensures that searches provided for in that provision will take place only "at the licensed location."

Furthermore, we do not think that the absence of a specific temporal limitation on searches in § 4728.06 is fatal to that subsection's constitutionality. While express limits on the number of searches are "a factor in an analysis of the adequacy of a particular statute," their absence is not determinative "so long as the statute, as a whole, places adequate limits upon the discretion of the inspecting officers." *Burger*, 482 U.S. at 711 n.21. In both *Dewey* and *Biswell*, the Supreme Court upheld statutes that, like here, neither expressly fixed the number of inspections within a particular time period, nor were expressly cabined to business hours. *Dewey*, 452 U.S. at 596–97 (citing 30 U.S.C. § 813); *Burger*, 482 U.S. at 691 n. 21 (citing *Biswell*, 406 U.S. at 312 n.1).

When § 4728.06 is read in conjunction with § 4728.07 and other PMDA provisions, we believe the statute "establishes a predictable and guided . . . regulatory presence." *Dewey*, 452 U.S. at 604. Section 4728.07's requirement that licensees make their purchasing records available daily puts licensees on notice that they may be subject to frequent related searches, such as those in § 4728.06, which provide inspectors with access to only minimally more information. *See Exotic Coins, Inc.*, 699 P.2d at 942 (noting that warrantless searches of records, "[w]hen viewed as an adjunct to the weekly reporting requirement . . . [were] unlikely to be so random, infrequent, or unpredictable that a legitimate expectation of privacy in its contents will arise" (citing *Dewey*, 452 U.S. at 598–99)). Moreover, under § 4728.06, licensees are aware that they must keep records in the first place, and under § 4728.09, that they must hold precious metals for certain periods of time. Since licensees know they must comply with these subsections, they are likewise on notice that such information may be subject to periodic search. This is part of the cost of doing business in a closely regulated industry. *Biswell*, 406 U.S. at 316; *cf. Hall v. Sweet*, 666 F. App'x 469, 476–77 (6th Cir. 2016).

In the absence of evidence that the state or the police are conducting searches of licensees' records and inventory under § 4728.06 in an unreasonable manner, we cannot say that this subsection is unconstitutional simply because it fails to use the magic words that searches may be conducted, for example, only at "reasonable times," *Biswell*, 406 U.S. at 319 n.1, or on "a regular basis," *Burger*, 482 U.S. at 711. These phrases offer little true notice as to when a business owner might be subject to search. To the contrary, the narrow scope of the searches, the

temporal language in § 4728.07, and the limitation on the place where searches may take place, coupled with the PMDA's other detailed requirements, on balance offset the warrantless intrusions provided for by §§ 4728.06 and 4728.07.

### 2. Section 4728.05(A) and Ohio Administrative Code § 1301:8-6-03(D)

Unlike the narrow warrantless searches contemplated by §§ 4728.06 and 4728.07, we agree with the district court that those authorized by § 4728.05(A) and Ohio Administrative Code 1301:8-6-03(D) are both unnecessary to furthering Ohio's stated interests and too broad in scope to withstand facial Fourth Amendment scrutiny.

### a. Necessity

While the former search provisions allow access to only discrete information, the latter are not so cabined, providing the state with ability to investigate the entire businesses of both licensees and non-licensees alike:

> The superintendent of financial institutions may, either personally or by a person whom the superintendent appoints for that purpose, if the superintendent considers it advisable, investigate the business of every person licensed as a precious metals dealer under this chapter, and of every person, partnership, and corporation by whom or for which any purchase is made, whether the person, partnership, or corporation acts, or claims to act, as principal, agent, or broker, or under, or without the authority of this chapter, **and for that purpose shall have free access to the books and papers thereof and other sources of information with regard to the business of the licensee or person and whether the business has been or is being transacted in accordance with this chapter**. The superintendent and every examiner may examine, under oath or affirmation, any person whose testimony may relate to any business coming within this chapter.

O.R.C. § 4728.05(A).

> **Inspection of books and records: All books, forms, and records, and all other sources of information with regard to the business of the licensee, shall at all times be available for inspection by the division for the purpose of assuring that the business of the licensee is being transacted in accordance with law.** All purchased items shall be kept at the licensed location for seventy-two hours from the time of purchase. All books, forms, records, etc., shall be kept at the licensed location.

Ohio Admin. Code § 1301:8-6-03(D).

The state's specified reason for needing access to this additional information is merely so that it can ensure compliance with the Act. As an example, it explains that it may need access to all of a dealer's records in order to ascertain whether he may qualify for exemption from licensure. But it is unclear why *warrantless* searches would be required to effectuate this compliance-based purpose. The need for quick action is gone, and in that sense, these subsections are more akin to the statute struck down in *Patel*, where Los Angeles was simply concerned that hotels were maintaining records in accordance with law. *Patel*, 135 S. Ct. at 2456.

As the Court found in *Patel*, most precious metals dealers will likely acquiesce to routine investigations. *Id.* at 2453 (recognizing that "the great majority of businessmen can be expected in normal course to consent to inspection without a warrant" (quoting *Barlow's, Inc.*, 436 U.S. at 316)). In fact, the state's chief examiner responsible for PMDA compliance testified that is exactly what typically happens. *See* R. 26, TRO Tr. at 85, PID 558 (explaining that it is "a very rare thing" for a dealer to refuse an inspector's request to look at records and stating that it had only happened "one time" in three years).

Furthermore, §§ 4728.05(B)–(E) expressly contemplate process-based remedies for inspectors, giving them authority, for example, to "[c]ompel by order or subpoena duces tecum the production of all relevant books, records, accounts, and other documents." *See* § 4728.05(B). These remedies undercut the notion that the Ohio General Assembly thought warrantless searches would be "crucial" to effectuate compliance with the Act. *Barlow's, Inc.*, 436 U.S. at 317–18. And, in fact, the state confirmed that it does resort to these process-based remedies when conducting inspections. R. 26, TRO Tr. at 85, PID 558 (state official explaining that if a dealer refuses to submit to a search, the inspector will merely "write that on the report" and then "just go back to the office"). One state official testified that the department only attempts to conduct routine inspections once "within the first sixth months" of a dealer becoming licensed and then "usually every 18 months" after that. R. 26, TRO Tr. at 79, PID 552. Being required to obtain a subpoena this infrequently—and only when a dealer does not consent—would impose very minimal burdens on the state. *See Allinder*, 808 F.3d at 1188 (citing *Barlow's, Inc.*, 436 U.S. at 316–19) (rejecting the "administrative burden" argument for necessity).

### b. Constitutionally Adequate Substitute

Because we find that § 4728.05(A) and Ohio Administrative Code § 1301:8-6-03(D) are unnecessary, they are therefore facially unconstitutional under the Fourth Amendment. Nevertheless, we note that these two provisions also fail the "certainty and regularity" part of the *Burger* test. Most notably, they are too broad in scope. Section 4728.05(A) applies to both licensees and non-licensees. While the former choose to enter the business of precious metals dealing, thereby subjecting them to the possibility of some government intrusion, the same is not true for non-licensees. Additionally, both statutes effectively allow searches of dealers' entire businesses. *See* § 4728.05(A) (allowing access to "books, papers [] *and other sources of information* with regard to the business of the licensee") (emphasis added); Ohio Admin. Code § 1301:8-6-03(D) (same). They therefore "do[] not provide any standards to guide inspectors . . . in the exercise of their authority to search." *Dewey*, 452 U.S. at 601. This is particularly concerning because some dealers, like Worthington Jewelers, may only buy and sell precious metals as a subset of their overall business. The provisions' seemingly unlimited scope, along with the grant of "free access" to such information "at all times," does not sufficiently constrain the discretion of the inspectors. *See Patel*, 135 S. Ct. at 2453. For this additional reason, § 4728.05(A) and Ohio Administrative Code § 1301:8-6-03(D) are facially unconstitutional.

**D.** **We need not address plaintiffs' as-applied challenges to § 4728.05(A) and Ohio Administrative Code 1301:8-6-03(D) and find the challenges to §§ 4728.06 and 4728.07 not ripe.**

Because we agree with the district court that the warrantless-search language found in § 4728.05(A) and Ohio Administrative Code § 1301:8-6-03(D) renders the provisions facially unconstitutional, we need not address plaintiffs' as-applied challenges to these sections. *See Heffner v. Murphy*, 745 F.3d 56, 67 n.7 (3d Cir. 2014) (citing *United States v. Salerno*, 481 U.S. 739, 745 (1987)). We do, however, conclude that plaintiffs' as-applied challenge to §§ 4728.06 and 4728.07 are not ripe. Both of these sections apply only to licensees. Liberty Coins admits that it does not hold a license. R. 98-1, Tomaso Decl. ¶ 3, PID 1140. Accordingly, it cannot be sanctioned for failing to comply with warrantless searches authorized by these provisions. And the record reveals that the state merely requested that Liberty Coins produce business records to determine whether it qualified for an exemption from licensure. R. 26, TRO Tr. at 74, PID 547;

R. 23-1, Exh. JXI at 1, PID 339.  But the state's only redress for Liberty Coins' failure to comply with this request was to issue a show cause order or impose fines, § 4728.05(E), and there is no evidence it did either, let alone execute a warrantless search.

While it is unclear whether Worthington Jewelers still maintains a license, there is likewise no evidence that the state or police ever requested or subjected it to either of the warrantless searches authorized by §§ 4728.06 or 4728.07.  Because we hold that these provisions are constitutional on their face, plaintiffs were required to provide some evidence that officials sought to apply them in an unconstitutional manner.  Without such evidence, plaintiffs' as-applied claims remain far too speculative for us to address.  *See Warshak v. United States*, 532 F.3d 521, 525–29 (6th Cir. 2008) (en banc).

### III

For the foregoing reasons, we **AFFIRM** in part the district court's grant of summary judgment to plaintiffs on their facial Fourth Amendment challenges to O.R.C. §§ 4728.05(A) and Ohio Administrative Code § 1301:8-6-03.  To be clear, we hold unconstitutional only the bolded language in these sections that purport to authorize warrantless searches—the same language that appears stricken in the parties' joint brief. *See* App. R. 27 at 1–2.  The remaining language in § 4728.05(A) and Ohio Administrative Code § 1301:8-6-03(D), which, for example, imposes certain recordkeeping requirements on precious metals dealers, remains in effect.  In the absence of exigent circumstances, the state is simply required to obtain consent, issue a subpoena, or obtain a probable cause warrant in order to effectuate searches of this information. We **REVERSE** the district court as to §§ 4728.06 and 4728.07, finding these provisions facially constitutional and dismiss plaintiffs' analogous as-applied challenges.