# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

February 23, 2023

Lyle W. Cayce
Clerk

No. 22-30105

---

MEXICAN GULF FISHING COMPANY, *partially owned by Billy Wells*; BILLY WELLS, *Captain, partially owns Mexican Gulf Fishing Company*; A&B CHARTERS INCORPORATED, *owned by Allen Walburn*; ALLEN WALBURN, *Captain, owns A&B Charters, Incorporated*; KRAIG DAFCIK, *Captain, part owner of the Alabama with A&B Charters*; VENTIMIGLIA, L.L.C., *owned by Frank Ventimiglia, doing business as* SANIBEL OFFSHORE FISHING CHARTERS; FRANK VENTIMIGLIA, *Captain, owns Ventimiglia, L.L.C.*; FISHING CHARTERS OF NAPLES, *owned by Jim Rinckey*; JIM RINCKEY, *Captain, owns Fishing Charters of Naples*; CAPT. JOEY D. CHARTER, INCORPORATED, *owned by Joey Dobin*; JOEY DOBIN, *Captain, owns Capt. Joey D. Charter, Incorporated*,

*Plaintiffs—Appellants*,

*versus*

UNITED STATES DEPARTMENT OF COMMERCE; GINA RAIMONDO, *in her official capacity as Secretary of Commerce*; NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION, *NOAA, a scientific agency within the Department of Commerce*; RICHARD W. SPINRAD, *in his official capacity as Administrator of National Oceanic and Atmospheric Administration*; NATIONAL MARINE FISHERIES SERVICE, *a line office within the National Oceanic and Atmospheric Administration, also known as NOAA Fisheries*; NICOLE R. LEBOUEF, *in her official capacity as Assistant Administrator for National Oceanic and Atmospheric Administration*,

*Defendants—Appellees*.

No. 22-30105

---

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:20-CV-2312

---

Before RICHMAN, *Chief Judge*, and ELROD and OLDHAM, *Circuit Judges*.
JENNIFER WALKER ELROD, *Circuit Judge*:[*]

The shores of the Gulf of Mexico are home to many charter boats. These modest vessels range in size from thirty to forty feet, and usually serve small businesses. When a charter-boat captain is not using the ship for personal recreation, he or she charters a trip for six to eight passengers, for sightseeing or some similar purpose. This is the type of boat a few friends might reserve for a fishing trip off the Galveston coast. And although recreational fishing is one of a charter boat's primary uses, the number of fish caught by anglers aboard a charter boat is relatively small; charter-boat fishing accounts for an estimated 0.20% of annual fishing in the Gulf of Mexico. This appeal concerns a regulation issued by the United States Department of Commerce that requires charter-boat owners to, at their own expense, install onboard a vessel monitoring system that continuously transmits the boat's GPS location to the Government, regardless of whether the vessel is being used for commercial or personal purposes.

We conclude that, in promulgating this regulation, the Government committed multiple independent Administrative Procedure Act violations, and very likely violated the Fourth Amendment. We are therefore compelled

---

[*] CHIEF JUDGE RICHMAN concurs in the judgment and joins Parts II.A.1.a, II.B.1, and III of the majority opinion. JUDGE OLDHAM concurs in the judgment and joins the majority opinion except as to its reliance on *Chevron USA Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).

No. 22-30105

to hold unlawful and set aside the regulation, reverse the judgment of the district court, and render judgment for the Appellants.

I

A

The Government issued the subject regulation pursuant to the Magnuson-Stevens Fishery Conservation and Management Act of 1976. That law and subsequent amendments are codified at 16 U.S.C. ch. 38. Together, the laws apply within the United States' exclusive economic zone, which extends two hundred nautical miles from each coastal state's seaward boundary. *Id.* § 1802(11). Chapter 38's stated purpose is, among other things, "to conserve and manage the fishery resources found off the coasts of the United States." *Id.* § 1801(b)(1). In pursuit of this goal, the Magnuson-Stevens Act creates supervisory bodies called fishery management councils that have jurisdiction in defined regions. *Id.* § 1852(a)(1). The body with jurisdiction in the Gulf of Mexico is called the Gulf Council. *Id.* § 1852(a)(1)(E).

The Act directs the regional councils to create and administer fishery management plans, 16 U.S.C. § 1852(h)(1), whose purpose is to "achieve and maintain, on a continuing basis, the optimum yield from each fishery." *Id.* § 1801(b)(4). It further requires that all management plans contain certain provisions, *id.* § 1853(a), and gives the regional councils discretion to include others, *id.* § 1853(b). Among other things, a management plan may require fishing vessels to obtain a for-hire permit. *Id.* § 1853(b)(1).[1] Also, all plans must accord with codified national standards. *See id.* § 1851. With respect to

---

[1] And in fact, the Gulf region management plans include such a requirement. *See, e.g.*, 50 C.F.R. § 622.20 (requiring a permit for Gulf reef fish); *see generally* 50 C.F.R. ch. VI, Pt. 622 (Fisheries of the Caribbean, Gulf of Mexico, and South Atlantic) (requiring permits for other fisheries).

No. 22-30105

the Magnuson-Stevens Act, the Department of Commerce has delegated regulatory authority to the National Oceanic and Atmospheric Administration, and NOAA regulates fisheries through the National Marine Fisheries Service (one of its subagencies).

B

NMFS and NOAA proposed the regulation at issue on October 26, 2018. *See* Fisheries of the Caribbean, Gulf of Mexico, and South Atlantic; Electronic Reporting for Federally Permitted Charter Vessels and Headboats[2] in Gulf of Mexico Fisheries, 83 Fed. Reg. 54069. The proposed rule contained three substantive components.

First, as mentioned above, the proposed rule would require charter-boat owners to install NMFS-approved Vessel Monitoring System hardware and software that transmit the vessel's GPS location "at least once per hour, 24 hours a day, every day of the year." 83 Fed. Reg. at 54076 (the GPS-tracking requirement). Further, "[a]s a condition of authorized fishing . . . a vessel owner . . . must allow NMFS [and] the U.S. Coast Guard . . . access to the vessel's position data obtained from the VMS or GPS." *Id.* at 54077. There are limited exceptions for when the vessel is in port or out of the water.

Second, the rule would require charter-boat owners to submit a report to NMFS before offloading any fish, detailing "all fish harvested and discarded, and any other information requested by the [Science and Research Director of NMFS]." 83 Fed. Reg. at 54076 (the business-information requirement). The rule does not define "other information," but it does note

---

[2] Fees for a headboat are assessed per-person, whereas fees for a charter boat are assessed per-trip. Unlike charter boats, headboats can carry as many as 70–80 passengers. Larger and more heavily-regulated that charter boats, headboats are not at issue here.

No. 22-30105

that reports should include "information about the permit holder, vessel, location fished, fishing effort, discards, and socio-economic data." *Id.* at 54071.

Third, the rule would require that, before a charter-boat owner may take a boat out to sea, he or she must submit a trip declaration to NMFS, indicating the purpose of the trip, such as for-hire, fishing recreational, or non-fishing. 83 Fed. Reg. at 54071 (the trip-declaration requirement). In the event of a for-hire trip, the owner must "report the expected trip completion date, time, and landing location." *Id.*

After notice and comment, NOAA and NFMS published the Final Rule on July 21, 2020. *See* Fisheries of the Caribbean, Gulf of Mexico, and South Atlantic; Electronic Reporting for Federally Permitted Charter Vessels and Headboats in Gulf of Mexico Fisheries, 85 Fed. Reg. 44005. The Final Rule adopted the GPS-tracking and trip-declaration requirements as initially proposed, but modified the description of the business-information requirement. As before, the latter rule did not define "other information," and the preamble explained that reports should include "information about the permit holder, vessel, location fished, fishing effort, discards, and socio-economic data." *Id.* at 44005. But in response to a comment concerning these data, the Final Rule gave the following additional information: "NMFS will require the reporting of five economic values per trip: The charter fee, the fuel price and estimated amount of fuel used, number of paying passengers, and the number of crew for each trip." *Id.* at 44011.

As promulgated by the Final Rule, the three requirements are codified in NOAA regulations as follows: 50 C.F.R. § 622.26(b)(5) (GPS-tracking requirement); *id.* § 622.26(b)(1) (business-information requirement); and *id.* § 622.26(b)(6) (trip-declaration requirement).

No. 22-30105

## C

Appellants (Plaintiffs below) are captains of charter boats operating in the Gulf of Mexico with federal for-hire permits, and their companies. They filed a class-action complaint in the Eastern District of Louisiana in August of 2020, naming as defendants the Department of Commerce, NOAA, NMFS, and related federal officials. The district court certified the class on June 2, 2021. The parties then filed cross summary judgment motions. The district court granted the Government's motion and denied Plaintiffs' motion, leading to this appeal. *See Mexican Gulf Fishing Co. v. U.S. Dept. of Commerce*, 587 F. Supp. 3d 428 (E.D. La. 2022).

The business-information and trip-declaration requirements went into effect on January 5, 2021, but NMFS delayed implementation of the GPS-tracking requirement. The effective date was set for March 1, 2022, and Appellants sought a stay of that requirement in the district court, but the motion was denied. Appellants then moved for an injunction pending appeal. A motions panel of this court denied that motion in an unpublished, *per curiam* order. All three requirements are therefore in effect.

## II

The focus of Appellants' challenge is the GPS-tracking requirement. Appellants maintain that this requirement violates the Fourth Amendment, exceeds the authority granted by the Magnuson-Stevens Act, and is arbitrary and capricious in violation of the Administrative Procedure Act. We begin with statutory authorization, consider the merits of the constitutional question (but do not reach them), and proceed to arbitrary-and-capricious review.

## A

The logically antecedent question is whether the Magnuson-Stevens Act authorizes NOAA and NMFS to issue the GPS-tracking requirement.

No. 22-30105

*See* 5 U.S.C. § 706(2)(C) (court must set aside agency action if it is "in excess of statutory . . . authority"). This question invokes the analytical framework set forth in *Chevron USA Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). The familiar framework proceeds in two steps. "At step one, we ask whether Congress has directly spoken to the precise question at issue, in which case we must give effect to the unambiguously expressed intent of Congress and reverse an agency's interpretation that fails to conform to the statutory text." *Huawei Technologies USA, Inc. v. FCC*, 2 F.4th 421, 433 (5th Cir. 2021) (internal quotation marks and citation omitted). This inquiry uses "authoritative Supreme Court decisions" and "conventional standards of statutory interpretation." *Chamber of Commerce v. U.S. Dept. of Labor*, 885 F.3d 360, 369 (5th Cir. 2018). "If the statute is silent or ambiguous as to the specific issue, we proceed to step two and ask whether 'the agency's answer is based on a permissible construction of the statute.'" *Huawei Technologies*, 2 F.4th at 433 (quoting *Alenco Comms., Inc. v. FCC*, 201 F.3d 608, 619 (5th Cir. 2000)). But if "the statute's text is unambiguous, we need not proceed to Step Two of *Chevron*." *Western Refining Southwest, Inc. v. FERC*, 636 F.3d 719, 727 (5th Cir. 2011).[3]

---

[3] The concurring opinion would jettison the *Chevron* framework and simply apply the traditional tools of statutory construction to analyze the issues presented. Indeed, the opinion conjures up *Chevron* as "the Lord Voldemort of administrative law." *Post* at 30 (quoting *Aposhian v. Wilkinson*, 989 F.3d 890, 896 (10th Cir. 2021) (Tymkovich, C.J., dissenting)). To be sure, *Chevron* has become something of the-precedent-who-must-not-be-named—left unmentioned by the Supreme Court in two recent decisions addressing the reasonableness of agency action. *See generally American Hospital Assn. v. Becerra*, 142 S. Ct. 1896 (2022); *Becerra v. Empire Health Foundation, for Valley Hospital Medical Center*, 142 S. Ct. 2354 (2022). And we recognize that the concurring judge and many other distinguished jurists—as well as some who are less distinguished, *see Cargill v. Garland*, 57 F.4th 447, 464–69 (5th Cir. 2023) (*en banc*)—have questioned *Chevron*'s consistency with our duty to say what the law is. But lest we not forget, "fear of a name increases fear of the thing itself." J.K. Rowling, *Harry Potter and the Sorcerer's Stone* 298 (1998). We therefore name *Chevron*, and apply its precedent—until and unless it is overruled by our highest Court.

No. 22-30105

1

a

In keeping with the above, the first inquiry is whether, based on traditional principles of statutory construction, the Magnuson-Stevens Act authorizes the GPS-tracking requirement. It is undisputed that no provision explicitly allows the Government to demand reporting of GPS information. Rather, the Government defends the requirement primarily by reference to 16.U.S.C. § 1853(b)(4). That paragraph authorizes NMFS to include a provision within a fishery management plan that mandates the use of particular equipment: "[A fishery management plan may] prohibit, limit, condition, or require the use of specified types and quantities of fishing gear, fishing vessels, or equipment for such vessels, including devices which may be required to facilitate enforcement of the provisions of this chapter." A VMS device is "equipment," the Government says, and so NMFS may require it.

Assuming *arguendo* that a VMS device is equipment, this argument fails because the Government does not demonstrate that such a device facilitates the enforcement of the Magnuson-Stevens Act. As the Appellants observe, "no provision of the MSA requires 24-hour GPS tracking of charterboat operators." To be sure, it could be possible that the GPS-tracking requirement facilitates the enforcement of *other* provisions. In this regard, the Government says that the GPS-tracking requirement is necessary to enforce the Act's data-collection provisions. *See* 16 U.S.C. § 1853(a)(5) (requiring that fishery management plans "specify the pertinent data which shall be submitted to the Secretary with respect to commercial, recreational, [and] charter fishing");[4] *id.* § 1851(a)(2) (mandating that "conservation and

---

[4] The data to be submitted includes, but is not limited to, "information regarding the type and quantity of fishing gear used, catch by species in numbers of fish or weight thereof, areas in which fishing was engaged in, time of fishing, number of hauls, economic

management measures shall be based upon the best scientific information available"); *id.* § 1801(a)(8) (finding as a matter of fact that "[t]he collection of reliable data is essential to the effective conservation, management, and scientific understanding of the fishery resources of the United States"). According to the Government, the GPS data "will help validate [fishing] effort and aid with enforcement of the reporting requirements." 85 Fed. Reg. at 44012. It also contends that the data "improves the accuracy and reliability of fishery data by providing trip validation—in other words, corroborating whether a vessel has left the dock."

Cutting against this argument is the fact that charter-boat owners are already required to report all of the information that the Government says the GPA-tracking requirement is designed to collect. That is, before going on a trip, charter-boat owners must tell the Government the type of trip (fishing or otherwise), and if it is a fishing trip, they must also tell the Government where they are going, how long they expect the trip will take, and when and where they expect to return. 50 C.F.R. § 622.26(b)(6). And they must report "all fish harvested and discarded," as well as other commercial information. *Id.* § 622.26(b)(1). What is more, the record lacks any evidence that charter-boat owners fail to accurately report their trips. Indeed, when asked at oral argument to identify one instance in which NOAA or NMFS documented inaccurate trip reporting, counsel for the Government failed to do so.

However, an agency is not necessarily required to show evidence of an actual violation before it takes steps to detect or enforce a violation. And in a self-reporting regulatory scheme, the Government surely has some interest in verifying the accuracy of self-reported data. The problem for NOAA and

---

information necessary to meet the requirements of this chapter, and the estimated processing capacity of, and the actual processing capacity utilized by, United States fish processors." 16 U.S.C. § 1853(a)(5).

NFMS, though, is that the GPS-tracking requirement does not conceivably enforce any statutory data-collection requirements. The data the Government demands does not communicate the location or duration of fishing, nor does it communicate the number and type of fish caught, or the equipment used to catch those fish. *See* 16 U.S.C. § 1853(a)(5). It only communicates a particular charter boat's exact location. Because that information does not further the enforcement of any provision of the Magnuson-Stevens Act, and based on the record before us, a VMS device is not "equipment" whose use the Government may mandate. 16 U.S.C. § 1853(b)(4).

b

The Government also argues that the GPS-tracking requirement is authorized under two catchall provisions. The first provision requires fishery management plans to "contain the conservation and management measures . . . which are necessary and appropriate for the conservation and management of the fishery." 16 U.S.C. § 1853(a)(1)(A). And the second provision authorizes plans to "prescribe such other measures, requirements, or conditions and restrictions as are determined to be necessary and appropriate for the conservation and management of the fishery." *Id.* § 1853(b)(14).

As an initial matter, we stress that the adjectives *necessary* and *appropriate* limit the authorization contained in this provision. *See Gulf Fishermens Assn. v. NMFS*, 968 F.3d 454, 465 (5th Cir. 2020) ("The grant of authority to promulgate necessary regulations cannot expand the scope of the provisions the agency is tasked with carry[ing] out.") (internal citations omitted). For this reason, the rule is authorized by the Magnuson-Stevens Act only if it is necessary and appropriate, which at a minimum requires that its benefits reasonably outweigh its costs. *National Grain & Feed Assn. v. OSHA*, 866 F.2d 717, 733 (5th Cir. 1988); *see also Texas Independent Ginners v. Marshall*,

No. 22-30105

630 F.2d 398, 411 n.44 (5th Cir. 1980) (explaining that the "expected costs" must be "reasonably related to the expected benefits").

These principles in mind, we must reject the Government's position because the asserted benefits from the GPS-tracking requirement do not bear any reasonable relationship to the undisputed costs. Start with the costs. The Final Rule found that installation of a VMS device would cost $3,000, with an additional $40 to $75 per month in service fees. *See* 85 Fed. Reg. at 44013. These are significant fees for charter-boat owners, for they primarily operate small businesses, with roughly $26,000 per year in net income. *See* 86 Fed. Reg. at 12165. And in addition to the financial cost, of course, the regulation imposes a massive privacy cost; demanding that charter-boat owners transmit their exact location to the Government, every hour of every day forever, regardless of why they are using the vessel.

What benefits does the Government point to in response? Next to nothing. It observes that "NMFS is charged with the conservation and management of the Nation's fisheries." That is certainly true, but the Government fails to connect the GPS-tracking requirement with any legitimate conservation purpose. By the Government's own telling, the only other purpose served by the requirement is to "verify whether a vessel is at the dock" and to "determine when a fishing trip was taken, and the length of that trip." 83 Fed. Reg. at 54071; 85 Fed. Reg. at 44009.[5] Perhaps such information might

---

[5] The full explanation to the cost concern is as follows: "[R]equiring each Gulf for-hire vessel be equipped, at a minimum, with archivable vessel location tracking (cellular VMS) best balances the need to collect and report timely information with the need to minimize the cost and time burden to the industry. The vessel location tracking system is an additional mechanism that verifies vessel activity without a report having to be completed by the vessel operators. The vessel location tracking system will allow NMFS to independently determine whether the vessel leaves the dock. This will help validate effort and aid with enforcement of the reporting requirements." 85 Fed. Reg. at 44009, 44012.

justify the inordinate costs imposed, if the Government truly needed it. But the Government already *has* this information. Indeed, at oral argument, counsel for the Government denied any awareness of inaccuracies in charter-boat owners' reporting of this same information in accordance with preexisting reporting requirements. In light of this fact, the benefit the Government obtains from receiving duplicative information is minimal, if not zero.

As a result, the Government has failed to show that the GPS-tracking requirement is necessary and appropriate for the conservation and management of the fishery. To be sure, a "strict cost-benefit analysis" is not required. *National Grain & Feed Assn.*, 866 F.2d at 733. Likewise, "we cannot say that the cost of compliance is unreasonable if the [regulation] in fact alleviates a grave danger." *Asbestos Information Assn. North America v. OSHA*, 727 F.2d 415, 424 (5th Cir. 1984). But here, the uncontroverted record shows that the regulation gives no meaningful benefit, let alone alleviates some great danger. Also, a necessary-and-appropriate condition requires more than just consideration of financial costs. It requires an analysis of the costs to constitutionally protected privacy interests too. *See Michigan v. EPA*, 576 U.S. 743, 752 (2015) ("[C]ost includes more than the expense of complying with regulations; *any disadvantage* could be termed a cost.") (emphasis added). Here, the Government failed to account for this crucial "cost of compliance . . . before deciding whether [the] regulation [was] appropriate and necessary." *Id.* at 751. As such, it did not "operate within the bounds of reasonable interpretation." *Id.* For these reasons, we must conclude that the expected costs associated with the GPS-tracking requirement are not "reasonably related" to its expected benefits. *Texas Independent Ginners*, 630 F.2d at 411.

\* \* \*

The record before us does not demonstrate that a VMS device, when used as required by the regulation, is "equipment . . . which . . . facilitate[s]

No. 22-30105

enforcement" of the Magnuson-Stevens Act, 16.U.S.C. § 1853(b)(4), or that such a device is "necessary and appropriate for the conservation and management of the fishery." *Id.* § 1853(a)(1)(A), (b)(14). Accordingly, on these facts, we hold that the Act does not authorize NOAA and NMFS to promulgate the GPS-tracking requirement.

2

We reach the holding above according to the statute's plain and unambiguous language. But, as explained above, the Government urges a broad reading of the Magnuson-Stevens Act—one that authorizes the GPS-tracking requirement even on the record before us. We therefore assume *arguendo* that it is ambiguous whether the relevant provisions mean what the Government says they mean. Even so, we are required to construe them against authorizing the Final Rule because to do otherwise would raise grave constitutional concerns. *See, e.g.*, *Hersh v. United States*, 553 F.3d 743, 754–55 (5th Cir. 2008) ("Where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress.") (quoting *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Building & Constr. Trades Council*, 485 U.S. 568, 575 (1988)); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 250 (2012).

a

To begin, the requirement that charter boats transmit their GPS location to the Government appears to be a search, and no warrant authorizes that search. In most circumstances, "a warrantless search is presumed to be unreasonable." *United States v. Riley*, 968 F.2d 422, 424 (5th Cir. 1992). But the Government invokes the closely-regulated-industry doctrine as an exception to that general rule. Beginning in the 1970s, the Supreme Court held that some industries "have such a history of government oversight that no

13

reasonable expectation of privacy exists." *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 313 (1978). For such an industry, the threshold for whether a search is reasonable for purposes of the Fourth Amendment is much lower. *New York v. Burger*, 482 U.S. 691, 702–03 (1987). Here, the district court held that "the fishing industry" is closely regulated and concluded under *Burger* that the GPS-tracking requirement does not violate the Fourth Amendment.

Appellants and several *amici* vigorously dispute that the exception applies here. First, they contend that the Supreme Court's decision in *City of Los Angeles v. Patel*, 576 U.S. 409 (2015), which held that the hotel industry is not closely regulated, changed the standard. *Patel* explained that the Court has recognized only four industries as being closely regulated: liquor sales, firearms dealing, mining, and the operation of an automobile junkyard. 576 U.S. at 424.[6] The Court explained its holding as follows: "Simply listing these industries refutes petitioners' argument that hotels should be counted among them. Unlike [each of the four], nothing inherent in the operation of hotels poses a *clear and significant risk to the public welfare*." *Id.* (emphasis added). Appellants and the *amici* argue that *Patel* requires that an industry be "intrinsically dangerous," in order to be pervasively regulated.

Since *Patel*, this argument has been raised several times. Among courts of appeals, it seems only the Sixth, Seventh, and Eighth Circuits have considered the issue. The Sixth and Seventh Circuits rejected the argument, instead holding that the extent to which an industry is dangerous is just a factor to be considered in the closeness analysis. *Liberty Coins, LLC v. Goodman*, 880 F.3d 274, 284–85 (6th Cir. 2018); *Owner-Operator Independent Drivers Ass'n v. U.S. Dept. of Treasury*, 840 F.3d 879, 894 (7th Cir. 2016). The Eighth

---

[6] *Colonnade Catering Corp. v. United States,* 397 U.S. 72 (1970) (liquor sales); *United States v. Biswell,* 406 U.S. 311 (1972) (firearms dealing); *Donovan v. Dewey,* 452 U.S. 594 (1981) (mining); *New York v. Burger,* 482 U.S. 691 (1987) (operation of a junkyard).

No. 22-30105

Circuit did not address the question at length, but seemed to say dangerousness is now a requirement. *Calzone v. Olson*, 931 F.3d 722, 724 (8th Cir. 2019) ("But in the case of commercial property that is involved in a closely regulated industry whose operation 'poses a clear and significant risk to the public welfare,' the property owner has a reduced expectation of privacy."). This court has said that the closeness analysis turns in part on "whether the industry would pose a threat to the public welfare if left unregulated," *Zadeh v. Robinson*, 928 F.3d 457, 465 (5th Cir. 2019), but was not directly confronted with the argument Appellants present here.

We now hold the Government has the better reading of *Patel*. Appellants fail to identify any textual or historical reason why the Fourth Amendment distinguishes between industries that pose a clear and significant risk to the public welfare, and those that do not. For this reason, we now join our sister Sixth and Seventh Circuits, and conclude that *Patel* "simply recognized that the industries the Court had deemed closely regulated in the past . . . were intrinsically dangerous." *Liberty Coins*, 880 F.3d at 284. *Patel* did not establish a new requirement for the closely-regulated-industry test.

b

Appellants next argue that the district court conducted its analysis too broadly. Specifically, they say the relevant industry is charter-boat fishing or recreational fishing, not commercial fishing. The district court disagreed, assessing whether the general fishing industry is closely regulated, and concluding that it is. This was error.

Dissenting in *Burger*, Justice Brennan warned that if the question of whether an industry is closely regulated is asked too broadly, "few businesses will escape such a finding." 482 U.S. at 721. The Supreme Court carried that warning forward in *Patel*, reiterating that "[t]he clear import of our cases it that the closely regulated industry . . . is the exception." 576 U.S. at 524

15

No. 22-30105

(quoting *Barlow's*, 436 U.S. at 313).  Loose application of this doctrine will "permit what has always been a narrow exception to swallow the rule." *Id.*

Because this exception is narrow, federal courts must not define the industry at issue at too high a level of generality.  Indeed, in *Zadeh*, this court was careful to explain that pervasive regulation within a subset of an industry does not necessarily extend to the whole industry.  928 F.3d at 466 ("We conclude, then, that the medical industry as a whole is not a closely regulated industry for purposes of *Burger*.  Still, even if the medical profession at large cannot be said to fall within these *Burger* factors, it is possible that a subset, such as those who prescribe controlled substances, would do so.").  Other circuit courts regularly make the same distinction.  *See, e.g.*, *United States v. Herrera*, 444 F.3d 1238, 1243–45 (10th Cir. 2006) (although the motor carrier industry may be a closely regulated industry, the exception does not apply to a man in a pickup truck); *McLaughlin v. Kings Island*, 849 F.2d 990, 994 (6th Cir. 1988) (although some industries covered by OSHA may be closely regulated, the exception does not apply to all such industries).

Here, the district court erred by failing to consider whether the *charter boat fishing industry* is closely regulated.  Indeed, all of the cases the district court cited for the proposition that fishing is a closely regulated industry specifically deal with *commercial* fishing.[7]  As an initial matter, the Government appears to take as granted that the commercial fishing industry is closely regulated.  We are not so sure.  True, the Government cites several decisions from two of our sister circuits that answered the question in the affirmative. *Lovgren v. Byrne*, 787 F.2d 857, 865 & n.8 (3d Cir. 1986); *Balelo v. Baldridge*,

---

[7] *Lovgren v. Byrne*, 787 F.3d 857, 860 (3d Cir. 1986); *Balelo v. Baldrige*, 724 F.2d 753, 765 (9th Cir. 1984); *United States v. Kaiyo Maru No. 53*, 699 F.2d 989, 997 (9th Cir. 1983); *United States v. Raub*, 637 F.2d 1205, 1209 (9th Cir. 1980) ("Commercial fishing has a long history of being a closely regulated industry.").

No. 22-30105

724 F.2d 753, 764–67 (9th Cir. 1984) (*en banc*); *United States v. Kaiyo Maru No. 53*, 699 F.2d 989, 994–97 (9th Cir. 1983). But all of these decisions pre-date *Burger*, which was the zenith of this doctrine, after which the Supreme Court has never again recognized an industry as closely regulated. Moreover, we have never directly considered the question, and do not address it here.

We do not address the general fishing industry because the relevant subject here is the charter boat fishing industry. As the *amici* States explain, federal statutes and regulations distinguish between fishing and charter-boat fishing, as well as between commercial and recreational fishing. On the latter point, the record shows that charter-boat fishing is more recreational than it is commercial in many respects.

The Government offers two unavailing responses. First, it contends that "courts have never approached *Burger* with Plaintiffs' self-serving level of granularity," but it neither cites authorities for this proposition nor tries to distinguish Appellants' arguments. Its only other claim is that "charter fishing is distinct from recreational fishing." That may well be true, but it does not follow that the subject of this analysis should be the general fishing industry. If anything, the legal distinctions the Government cites emphasize the need to precisely identify the scope of the industry at issue.

c

Turning to the merits, we have understood the closely related industry inquiry to turn on several factors: "The history of warrantless searches in the industry, how extensive the regulatory scheme is, whether other states have similar schemes, and whether the industry would pose a threat to the public welfare if left unregulated." *Zadeh*, 928 F.3d at 465 (citing *Burger*, 482 U.S. at 704 and *Patel*, 576 U.S. at 424). Applying the factors to the proper subject, we conclude that the charter boat fishing industry is not closely regulated.

17

As an initial matter, the record shows there are significant differences between the charter-boat fishing industry and the general commercial fishing industry. As previously stated, charter-boat fishing accounts for only .20% of annual fishing in the Gulf of Mexico. In addition, charter boats are typically owned by small businesses, and are commonly used both for non-fishing commercial purposes, like sightseeing or personal recreation. In short, the charter boat fishing industry is different in kind and degree from the commercial-fishing industry.

Those general differences in mind, we now directly address the factors listed above. First, the record is devoid of any evidence of history of warrantless searches within the charter boat fishing industry. *Zadeh*, 928 F.3d at 465. To be sure, the Government points to some evidence of a tradition of warrantless searches with respect to the commercial fishing industry. But it fails to connect that history to the particular industry at issue here. After all, it is "the effect of such regulation upon an owner's expectation of privacy," that really matters, not history for its own sake. *Burger*, 482 U.S. at 701. Here, there is simply no evidence that a pattern of warrantless searches within the commercial fishing industry ever extended down to charter boats, such that it would alter the expectation of privacy in this context. Likewise, the Government offers no evidence that States employ regulatory schemes respecting the charter boat fishing industry. *Zadeh*, 928 F.3d at 465.

Finally, there is no evidence in the record that the charter boat fishing industry "would pose a threat to the public welfare if left unregulated." *Id.* at 465. The Government responds that, if left unregulated, the fishing industry would pose a serious risk of overfishing and depleting a critical food supply. 16 U.S.C. § 1801 ("A national program for the conservation and management of the fishery resources of the United States is necessary to prevent overfishing."). But this makes the same mistake as before: it considers the risk of the general fishing industry, instead of considering the risk of the

18

particular charter-boat fishing industry. And the only evidence presented here shows that charter-boat fishing does *not* pose an overfishing risk because it accounts for a small percentage of total fishing within the Gulf of Mexico.

We reiterate the Supreme Court's instruction that "the closely regulated industry . . . is the exception," not the rule. *Patel*, 576 U.S. at 524. Our highest Court has recognized only four industries as closely regulated, and none since 1987. And in the dozens of cases we have considered in this area of the law, our court has extended the doctrine only twice: to the coal mining industry, *Marshall v. Texoline Co.*, 612 F.2d 935, 938 (5th Cir. 1980), and to the commercial trucking industry, *United States v. Fort*, 248 F.3d 475, 480 (5th Cir. 2001). We must be tremendously cautious in extending this doctrine, lest we "permit what has always been a narrow exception to swallow the rule." *Patel*, 576 U.S. at 524. That caution is needed to ensure that future recognition of a closely regulated industry, if any, will be consistent with the original public meaning of the Fourth Amendment. (Or perhaps, for state penal laws, consistent with the original public meaning of the Fourteenth Amendment. *See New York State Rifle & Pistol Assn. v. Bruen*, 142 S. Ct. 2111, 2162–63 (2022) (Barrett, J., concurring)). The legitimacy of any categorical exception to that Amendment rests, of course, on the exception's accordance with constitutional text, history, and tradition—as interpreted and explained by our highest Court. *See, e.g.*, *Atwater v. City of Lago Vista*, 532 U.S. 318, 326 (2001) ("In reading the [Fourth] Amendment, we are guided by 'the traditional protections against unreasonable searches and seizures afforded by the common law at the time of the framing' . . . .") (quoting *Wilson v. Arkansas*, 514 U.S. 927, 931 (1995)).

Here, the Government presents no evidence whatsoever tending to show that the charter boat fishing industry is closely regulated. On the contrary, all the pertinent evidence suggests the opposite. We therefore decline

No. 22-30105

to expand the narrow exception, and conclude that the charter-boat fishing industry is not closely regulated.

\*        \*        \*

In light of our holding immediately above, the constitutionality of the GPS-tracking requirement turns on whether charter-boat owners have a legitimate expectation of privacy to the whole of their movements while at sea, and, if so, whether the regulation violates that expectation. *Byrd v. United States*, 138 S. Ct. 1518, 1526 (2018); *Katz v. United States*, 389 U.S. 347, 351–52 (1967). We have serious concerns that the GPS requirement violates the Fourth Amendment in this circumstance, given the Supreme Court's instruction that members of the public have a "reasonable expectation of privacy in the whole of their movements." *Carpenter v. United States*, 138 S. Ct. 2206, 2217 (2018); *see United States v. Jones*, 565 U.S. 400, 413 (2012) (Sotomayor, J., concurring); *id.* at 430 (Alito, J., concurring in the judgment). Ultimately, we need not address the merits of this question because, as explained above, the requirement violates the APA for other, non-constitutional reasons. But to the extent that it is ambiguous whether the provisions at issue should be accorded the broad reading advanced by the Government, our interpretation is further supported by the obligation to construe texts to avoid "serious constitutional problems." *Hersh*, 553 F.3d at 754 (quoting *Edward J. DeBartolo Corp.*, 485 U.S. at 575).[8]

---

[8] We reiterate that our opinion does not answer the Fourth Amendment question on the merits. In addition, nothing in our discussion of the pervasively regulated industry doctrine is intended to call into question reasonable and historical regulatory practices on government land. *See, e.g.*, *United States v. Williams*, 617 F.2d 1063, 1077–79 (5th Cir. 1980) (*en banc*) (warrantless searches of vessels at sea).

B

Next, Appellants present two arguments for why the GPS-tracking requirement is arbitrary and capricious. First, that NOAA and NMFS failed to address privacy concerns expressed in public comments. And second, that the agencies did not adequately justify the GPS-monitoring requirement's costs and benefits. We agree on both counts.[9]

The APA instructs courts to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "Arbitrary and capricious review focuses on whether an agency articulated a rational connection between the facts found and the decision made." *ExxonMobil Pipeline Co. v. U.S. Dept. of Transportation*, 867 F.3d 564, 571 (5th Cir. 2017) (internal quotation marks and citation omitted). "In reviewing that explanation, we must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Texas v. EPA*, 983 F.3d 826, 835 (5th Cir. 2020) (quoting *Motor Vehicle Mfrs. Assn. of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

In turn, to determine whether the agency considered the relevant factors, the court must decide whether the agency addressed any "significant points . . . raised by the public comments." *Huawei Technologies*, 2 F.4th at 449 (quoting *Carlson v. Postal Regulatory Commn.*, 938 F.3d 337, 344 (D.C. Cir. 2019)). "Comments are 'significant,' and thus require response, only if they raise points 'which, if true . . . and which, if adopted, would require a

---

[9] Our holding in Part II.A is sufficient to demand that we render judgment for the Appellants. As such, our conclusions in Parts II.B.1, II.B.2, and III should be understood as independently sufficient alternative holdings. In the Fifth Circuit, "alternative holdings are binding precedent and not obiter dictum." *Jarkesy v. SEC*, 34 F.4th 446, 459 n.9 (5th Cir. 2022) (quoting *Texas v. United States*, 809 F.3d 134, 178 n.158 (5th Cir. 2015)).

change in an agency's proposed rule.'" *Id.* (quoting *City of Portland v. EPA*, 507 F.3d 706, 714–15 (D.C. Cir. 2007) (alteration in original)).

1

Appellants contend that the Final Rule failed to address Fourth Amendment concerns expressed in several public comments. At least three individuals submitted an identical comment expressing this concern. The relevant text of these comments is as follows:

> There are versions of the eVTRs [electric vessel trip reporting] that provide all transiting details from the time the vessel leaves the dock, fishes and returns back to the dock. Start and end time are already recorded on the eVTR. *Providing all confidential transiting details is a violation of our 4th Amendment right to privacy and not necessary to manage the fishery.* Such details are considered confidential by NOAA and utilized by other agencies not associated with management of the fishery. This is a dangerous precedent. Fish have tails, they move and with the climatic shift and movement of our fish into new areas over the last several years utilizing such historical data for fishery management purposes is flawed and can be misused to deny us access to the fishery. Therefore to require detailed GPS data for vessels utilized by the for hire community is not necessary for fishery management purposes, flawed if used for fishery management purposes due to the climatic shift of our stocks and is also a violation of our 4th Amendment rights. Therefore, I can't recommend mandatory use of GPS other than what is presently required by NOAA.

(emphasis added). NOAA and NMFS interpreted these comments to be expressing a concern relating to the handling of proprietary data. The Final Rule responded to this point, assuring the public that "data submitted to NMFS under the Gulf For-hire Reporting Amendment shall be confidential and shall not be disclosed." 85 Fed. Reg. at 44010.

The district court dismissed this claim, reasoning that the comments cited above did not clearly state their privacy concerns. An agency "need not sift pleadings and documents to identify arguments that are not stated with clarity by a petitioner." *Mexican Gulf Fishing Co.*, 587 F. Supp. 3d at 466 (quoting *Huawei Technologies*, 2 F.4th at 449). Having addressed the data-confidentiality issue, the district court concluded, NMFS "was not required to dig for another basis of generalized Fourth Amendment concerns." *Id.*

However, we must agree with the Appellants because the personal-privacy concern is clear from the face of these comments. Indeed, the comments explicitly asserted that the proposed rule violated their "4th Amendment right to privacy." To be sure, an agency need not respond to issues stated unclearly. *Huawei Technologies*, 2 F.4th at 449. But neither must a comment be written by a legal or technical expert in order to put an agency on notice of a particular concern. In short, the requirement for an agency to respond to significant issues raised by public comments would be utterly toothless if it could ignore comments like those presented here. *See Texas v. Biden*, 10 F.4th 538, 554 n.4 ("[T]he opportunity to comment is meaningless unless the agency responds to significant points raised by the public.") (quoting *Sherley v. Sebelius*, 689 F.3d 776, 784 (D.C. Cir. 2012)).

Moreover, the personal-privacy concern is obvious from the invocation of the Fourth Amendment. The Supreme Court's corpus of Fourth Amendment case law on warrantless government surveillance is legion. *Carpenter v. United States*, 138 S. Ct. 2206 (2018); *United States v. Jones*, 565 U.S. 400 (2012); *Kyllo v. United States*, 533 U.S. 27 (2001); *United States v. Knotts*, 460 U.S. 276 (1983); *Smith v. Maryland*, 442 U.S. 735 (1979); *Alderman v. United States*, 394 U.S. 165 (1969); *Katz v. United States*, 389 U.S. 347 (1967); *McDonald v. United States*, 335 U.S. 451 (1948); *Goldstein v. United States*, 316 U.S. 114 (1942). The assertion that the Government failed to identify this particular concern from the public comments borders on incredible.

The Government responds that its interpretation of the public comments need only be "reasonable." That is true, but the standard of review does not grant the Government free license to interpret comments in a manner that ducks the hard questions. Indeed, too much deference would essentially allow the Government to bury its head in the sand. The Administrative Procedure Act demands more than this.

Having determined that the public comments raised a significant issue, we must now determine whether the Government sufficiently addressed that issue. We are compelled to conclude in the negative because, as all agree, the Government did not address the issue at all. *See, e.g.*, *Carlson*, 938 F.3d at 345–48; *Hewitt v. Commr. of IRS*, 21 F.4th 1336, 1353 (11th Cir. 2021). Nor is there any doubt that the personal-privacy issue is significant for purposes of the APA. If the GPS-tracking requirement violates the Fourth Amendment—and we have grave concerns that it might—that constitutional issue surely "would require a change" in the proposed rule. *Huawei Technologies*, 2 F.4th at 449 (quoting *City of Portland*, 507 F.3d at 715). The Final Rule violates the APA for this additional reason.

2

Last, Appellants argue that the GPS-tracking requirement is arbitrary and capricious because NOAA and NMFS failed to justify the costs the rule would impose on the charter-boat fishing industry. In this regard, a regulation is arbitrary and capricious if the agency "failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43. This includes, of course, considering the costs and benefits associated with the regulation. *See, e.g.*, *Michigan*, 576 U.S. at 751. In other words, the agency's "reasons and policy choices" must "satisfy minimum standards of rationality." *Pub. Citizen v. EPA*, 343 F.3d 449, 455 (5th Cir. 2003).

No. 22-30105

This argument succeeds for the same reason that the necessary-and-appropriate provisions do not authorize the GPS-tracking requirement: the Government has failed to demonstrate that it would obtain meaningful benefits from the GPS data. *Supra* Part II.A.1.b. The data only tells the Government what it already knows: when a charter boat embarks on a trip, how long it is gone, and when it returns. Although the Government stresses the value of verifying this information, verification is entirely duplicative where, as here, the Government offers no evidence that the preexisting reporting is inaccurate. And, as explained above, it is unclear from this record what, if anything, GPS data would tell the Government about where fishing occurs, how long fishing occurs, and what equipment is used for fishing. Those insignificant benefits do not bear a rational relationship to the serious financial and privacy costs imposed. As a result, the GPS-tracking requirement is arbitrary and capricious. *Pub. Citizen*, 343 F.3d at 455.

\* \* \*

In summary, the GPS-tracking requirement is unlawful for several independently sufficient reasons. First, because the unambiguous language of the Magnuson-Stevens Act does not authorize the regulation. And the need to interpret regulations against creating constitution problems lends further support to our construction of that language. Second, because the Government failed to respond to public comments expressing concerns of personal-privacy violations stemming from GPS surveillance. And third, because the Government failed to rationally consider the associated costs and benefits.[10]

---

[10] Appellants offer two final arguments respecting the GPS-tracking requirements: (i) that the requirement constitutes "forced commerce" because it instructs charter-boat owners to install a VMS device at their own expense, and (ii) that the district court's interpretation of the necessary-and-appropriate provisions within the Magnuson-Stevens Act constitute a delegation of regulatory power without an "intelligible principle." *See*

No. 22-30105

## III

Appellants' final argument concerns a different component of the Final Rule: the business-information requirement. Appellants contend that this requirement violates the APA because the final version is not a "logical outgrowth" of the proposed rule. *Huawei Technologies*, 2 F.4th at 447 (quoting *National Lifeline Assn. v. FCC*, 921 F.3d 1102, 1115 (D.C. Cir. 2019)). In this regard, the Government must "adequately frame the subjects for discussion," such that "the affected party 'should have anticipated' the agency's final course in light of the initial notice." *Id.* at 447 (quoting *National Lifeline Assn.*, 921 F.3d at 1115); *see also CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1080 (D.C. Cir. 2009) (explaining that members of the public need not "divine [the agency's] unspoken thoughts") (internal quotation marks and citation omitted).

The Proposed and Final Rule describe the business-information requirement in the same manner: reports must include "all fish harvested and discarded, and any other information requested by the [Science and Research Director of NMFS]." 83 Fed. Reg. at 54076; 85 Fed. Reg. at 44017. Neither version defines *other information*. Both versions explain that the report must include "information about the permit holder, vessel, location fished, fishing effort, discards, and socio-economic data." 83 Fed. Reg. at 54071; 85 Fed. Reg. at 44005. The only difference is that the Final Rule also specifies five entries that will be required: "NMFS will require the reporting of five economic values per trip: The charter fee, the fuel price and estimated amount of fuel used, number of paying passengers, and the number of crew for each trip." 85 Fed. Reg. at 44011.

---

*Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019). Because we conclude that the GPS-tracking requirement is unlawful on other grounds, we do not reach these arguments.

No. 22-30105

The Final Rule did not provide "fair notice" because it required the reporting of an entirely different category of data than the data described in the Proposed Rule. *Texas Assn. of Manufacturers v. U.S. Consumer Product Safety Commn.*, 989 F.3d 368, 381 (5th Cir. 2021). The Proposed Rule gave notice of the potential obligation to report socio-economic data. The adjective *socio-economic* means "that derives from both social and economic factors; that combines both factors to provide an indication of a person's or a group's effective social situation, especially as a *socio-economic class*." 15 *The Oxford English Dictionary* 915 (2d ed. reprint 1991); *see also Webster's Third New International Dictionary* at 2163 ("[O]f, relating to, or involving a combination of social and economic factors. *Specif*; of or relating to income and social position considered as a single factor."). As such, this word limits the noun *data* to items that are both social and economic in nature.

None of the data listed in the Final Rule—charter fee, the fuel price and estimated amount of fuel used, number of paying passengers, and the number of crew for each trip—are socio-economic in essence. Rather, they are all purely economic. Indeed, that is how the regulation describes them, using the label "economic values." 85 Fed. Reg. at 44011. The Government argues that socio-economic data necessarily include economic factors, and thus that Appellants were on notice the Final Rule may demand reporting of such factors. But that argument would rewrite the rule to say "social or economic data" instead of "socio-economic data."

As understood by Appellants, socio-economic is "a broad term that encompasses age, marital status, income, race, religion, sexual preference, health status, and political affiliation to name a few." This argument better comports with the language's plain meaning. If an ordinary person were asked about her socio-economic status, she would instinctively report her education, annual income, occupation, and the like. To be sure, some socio-economic data—like annual income—is more focused on the economic

27

component than on the social component. But the reason annual income is properly classified as socio-economic is that it furthers that word's meaning. That is, a person's annual income informs that person's "effective social situation." 15 *The Oxford English Dictionary* 915. The data the Government seeks to collect go only to charter-boat owners' business operations. They do not relate to "income and social position considered as a single factor," *Webster's Third New International Dictionary* 2163, and so cannot be properly characterized as socio-economic in nature.

When the Government said it may require reporting of socio-economic data, the public was entitled to take that statement at face value. To be sure, an agency need not "spell out with particularity the proposed meaning" of every term in a proposed rule. *United Steelworkers of America, AFL-CIO-CLC v. Schuylkill Metals Corp.*, 828 F.2d 314, 318 (5th Cir. 1987). But here, the Government expressly contradicted itself by including a requirement that was not within the scope of the obligations set forth in the Proposed Rule. As such, we must reject the contention that the public "should have anticipated the agency's final course in light of the initial notice." *Huawei Technologies*, 2 F.4th at 447 (quoting *Natl. Lifeline Assn.*, 921 F.3d at 1115).

The Government also points to several comments submitted by members of the public that expressed concern that economic data might be required, arguing that these comments support its assertion that the public was on notice that the Final Rule might require the reporting of purely economic values. Several commenters did indeed address economic reporting, but the Government draws the wrong inference from this fact. These comments show only that a few members of the public happened to "divine" the Government's "unspoken thoughts." *CSX Transp.*, 584 F.3d at 1080. Comments such as these do not satisfy the Government's obligation to afford the general public an opportunity to respond to clearly stated proposals. Indeed, we have expressly rejected that reasoning. *See Tex. Assn. of Manufacturers*,

989 F.3d at 383 ("The fact that one commenter suggested that data above the 95th percentile is too unstable for rulemaking does not relieve the Commission of its burden to provide notice and an opportunity to comment on the clearly articulated justification for its use of such data.").

The Government gave notice that it would require reporting of socio-economic data, but ultimately required the reporting of five purely economic data points. We are therefore compelled to hold that, in promulgating a requirement that is different in kind than the proposed requirement, the Government did not adequately frame the subjects for discussion. *Huawei Technologies*, 921 F.3d at 1115. It therefore did not provide an opportunity for interested persons to participate in rulemaking, and in so doing violated the APA. 5 U.S.C. § 553(b)(2), (b)(3).

IV

In conclusion, two components of the Final Rule are unlawful. First, the Magnuson-Stevens Act does not authorize the Government to issue the GPS-tracking requirement. In addition, that rule violates the Administrative Procedure Act because it is arbitrary and capricious, in turn because the Government failed to address Fourth Amendment issues when considering it and failed to rationally consider the associated costs and benefits. Second, the business-information requirement violates the APA because the Government did not give fair notice that it would require the type of data specified in the Final Rule.

We therefore HOLD UNLAWFUL and SET ASIDE the Final Rule, REVERSE the judgment of the district court, and RENDER judgment for the Appellants.

No. 22-30105

Andrew S. Oldham, *Circuit Judge*, concurring in part:

I join the court, except as to its invocation of *Chevron*. That's for two reasons. First, the Supreme Court has directed us to use "the traditional tools of statutory interpretation" in lieu of *Chevron. Am. Hosp. Ass'n v. Becerra*, 142 S. Ct. 1896, 1906 (2022). In two cases just last Term, both of which directly implicated *Chevron* and the "reasonableness" *vel non* of an agency's statutory interpretation, the Court did not even cite the case. *See ibid.*; *Becerra v. Empire Health Found., for Valley Hosp. Med. Ctr.*, 142 S. Ct. 2354 (2022). Second, it's unclear how "the Lord Voldemort of administrative law" comports with our legal history and tradition. *Aposhian v. Wilkinson*, 989 F.3d 890, 896 (10th Cir. 2021) (Tymkovich, C.J., dissenting); *see also Buffington v. McDonough*, 143 S. Ct. 14, 16–19 (2022) (Gorsuch, J., dissenting from the denial of certiorari); *Baldwin v. United States*, 140 S. Ct. 690, 691–94 (2020) (Thomas, J., dissenting from the denial of certiorari); Aditya Bamzai, *The Origins of Judicial Deference to Executive Interpretation*, 126 Yale L.J. 908 (2017). Accordingly, I'd use the Supreme Court's instructions and the traditional tools of statutory interpretation to hold the GPS-tracking requirement violates the unambiguous text of the Magnuson-Stevens Act.